**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

RAYMOND A. GIBBS,
Plaintiff,

v.

MICHAEL J. ASTRUE,
Commissioner,
Social Security Administration,
Defendant.

**CIVIL ACTION**
**No. 11-40089-TSH**

**MEMORANDUM OF DECISION AND ORDER ON PLAINTIFF'S MOTION FOR ORDER REVERSING THE DECISION OF THE COMMISSIONER (Docket No. 11) AND DEFENDANT'S MOTION FOR ORDER AFFIRMING THE DECISION OF THE COMMISSIONER (Docket No. 14)**

**September 30, 2013**

**HILLMAN, D.J.**

## Nature of the Case

Plaintiff Raymond A. Gibbs ("Gibbs" or "Plaintiff") has brought this action against the Defendant, Michael J. Astrue, as Commissioner of Social Security Administration ("Commissioner") seeking judicial review of a final decision by the Commissioner denying his application for Social Security Disability Insurance benefits ("SSDI") and Supplemental Security Income benefits ("SSI"). The Commissioner denied Gibbs's application on the grounds that his impairments do not render him disabled. Gibbs argues that Commissioner's decision is not based

upon substantial evidence and, therefore, should be reversed or remanded for further proceedings. The Commissioner has file filed a motion for an order affirming the decision.1

**Background**

Gibbs filed applications for SSDI and SSI on December 4, 2008. *Tr.*, at p. 115, 122. In his SSI application, Gibbs stated that his disability began on August 1, 2003. *Id.*, at p. 122. In his SSDI application, Gibbs stated that he became unable to work as of August 21, 2008. *Id.*, at 115. On May 18, 2009, the Social Security Administration ("SSA") found Gibbs "not disabled" and denied both applications. *Id.*, at p. 50. In October 2009, the SSA denied Gibbs's request for reconsideration. *Id.*, at p. 57.

On November 30, 2010, Gibbs received a hearing before an Administrative Law Judge ("ALJ"). On December 22, 2010, ALJ Masengill ruled that Gibbs was "not disabled." *Id.*, at p. 44–45. The SSA Decision Review Board ("Board") selected the decision for review. On March 28, 2011, the Board informed Gibbs that it had not completed its review within the time allowed and therefore, ALJ Masengill's decision became the final decision of the SSA. *Id.*, at p. 1.

**Findings of Fact**

Gibbs last met the insured status requirement of the Social Security Act ("Act") on June 30, 2009. *Id.*, at p. 37. The hearing before ALJ Masengill took place on November 30, 2010. The following facts are found as of the hearing date.

*1. Educational, Occupational and Personal History*

Gibbs is fifty-three years old. *Id.*, at p. 122. He is approximately 5' 6" tall and weighs 160 pounds. *Id.*, at p. 11. He is unmarried and has no children. *Id.*, at p. 12. Gibbs testified that when he was seven and eight years old, he was sexually abused. *Id.*, at p. 18, 615. His mother was an

1 A copy of the Administrative Transcript ("*Tr.*")(Docket No. 7) has been provided to the Court under seal.

alcoholic. *Id.*, at p. 615. Gibbs completed high school and one semester of college. *Id.*, at p. 10, 460. He is able to read and write in English. *Id.*, at p. 10.

Gibbs served in the United States Marine Corps and received an honorable discharge for medical reasons (alcoholism), in either 1978 or 1979. *Id.*, at p. 115, 11. Due to several DUI convictions, the state of Florida revoked his drivers license for life. *Id.*, at p. 12. He served jail time in 1997 in relation to a DUI conviction. *Id.*, at p. 12. He also served time for petty theft after stealing a bottle of beer. *Id.*

For approximately 25 years, or up until 2007, Gibbs worked as an "electrician's helper" for various electrical contractors. *Id.*, at p. 13, 134, 141, 361, 333. In approximately 2005, he completed sixty-six hours of training courses in electrical code theory and information technology. *Id.*, at 352–53, 361, 363. However, he was unable to learn the formulas required to obtain "journeyman status." *Id.*, at p. 322. Gibbs's most recent electrical contracting employer fired him because of disrespectful conduct. *Id.*, at 154. In November 2007, Gibbs found work through a veteran vocational rehabilitation program. *Id.*. at p. 346–51. However, Gibbs quit within a few days because he felt overqualified and slighted. *Id.*. at p. 346–51. Similar problems led to Gibbs's termination from a dishwashing job in 2008. *Id.*, at p. 13, 154. During a vocational assessment in 2007, Gibbs stated that he was studying for certificates in information technology and was "really good" at fixing electrical systems and computers. *Id.*, at p. 351–359

Gibbs has spent approximately ten years living on the streets, in shelters, and at numerous detoxification facilities. *Id.*, at p. 18, 354, 615. Since 2008, he has lived alone in a one-bedroom apartment in Worcester. *Id.*, at p. 12. He receives support from transitional assistance and other welfare programs. *Id.*, at p. 14. In January 2009, he successfully completed a vocational rehabilitation program. It was reported that he participated in the CWT program, working in the

housekeeping department 32 hours per week; his attitude, attendance and job performance were rated highly satisfactory. Upon discharge, he was opined to be employable. *Id.*, at pp. 430-35.

*2. Daily Activities*

Gibbs relies on public transportation and rides his bike to get around. *Id.*, at p. 12, 21, 796. He testified that he frequently gets on the wrong bus and has trouble remembering or finding the correct bus lines. *Id.*, at p. 21. Gibbs is able to clean, groom and dress himself. *Id.*, at p. 18, 148. Additionally, he does his own laundry and cooks for himself. *Id.*, at p. 18, 148. Gibbs checks his e-mail every day and pays his own bills. *Id.*, at p. 19. Gibbs attends church services twice per week. *Id.*, at p. 19. However, Gibbs testified that some days "everything's just terrible," and on those days he remains home and does not answer the phone or doorbell. *Id.*, at p. 22.

*3. Plaintiff's Historical Medical History*

Gibbs has a long history of substance abuse issues that includes an eight-year cocaine addiction and over thirty years of alcohol dependence. *Id.*, at p. 12, 19, 305, 336, 379, 615. However, prior to a relapse in February 2010, Gibbs testified that he had been sober for two years. *Id.*, at p. 19. Following his February relapse, Gibbs remained sober. *Id.*, at 20. Additionally, Gibbs testified that although he used to be a "two-pack-a-day smoker," he has since cut-down to five cigarettes per day. *Id.*, at p. 17. Gibbs has numerous respiratory problems including Chronic Obstructive Pulmonary Disorder ("COPD") and seasonal asthma. *Id.*, at p. 16. He uses three separate inhalers as treatment. *Id.*, at p. 16. In 2004, Gibbs received treatment for Hepatitis C. *Id.*, at p. 15.

Gibbs testified that he has bursitis in his left hip and torn cartilage in his right hip. *Id.*, at p. 15. At the hearing, Gibbs reported that he felt pain in his right hip, lower spine, and back. *Id.*, at p. 16. When asked to rate the intensity of his pain on a scale from one to ten (ten being most severe),

Gibbs stated that without medication his pain is a level ten; with medication, his pain decreases to a level seven or eight. *Id.*, at p. 16. Gibbs attends physical therapy for his conditions. *Id.*, at p. 15.

Gibbs testified that he suffers from depression and post traumatic stress problems. *Id.*, at p. 17–18. Gibbs stated that his post traumatic stress issues come from the sexual abuse he suffered as a child and his experiences while living homeless. Id., at p. 18. He complained of nightmares, feelings of isolation, despair and nervousness. *Id.*, at p. 17. As treatment, Gibbs sees a therapist, attends weekly therapy sessions at the Veterans' Affairs Clinic, and AA meetings. *Id.*, at p. 17. Gibbs also takes Seroquel, which, as a side effect, causes him to feel hungry. *Id.*, at p. 18. He has not been hospitalized for mental health issues within the past two and a half years. *Id.*, at p. 18.

*4. Medical Findings*[2]

On October 14, 2008, Gibbs visited Dr. Ainun Haq for help for his alcohol dependency, respiratory problems, and mental health issues. *Id.*, at p. 195. Dr. Haq affirmed Gibbs's past COPD diagnosis, prescribed inhalers, ordered x-rays, and referred Gibbs to a pulmonologist. *Id.*, at p. 195. After completing a physical examination, Dr. Haq stated: "all joints are normal, no swelling, and no redness. Good range of motion in all joints. Spine straight, not tender." *Id.*, at p. 196. Dr. Haq provided Gibbs with the phone number for Alcoholics Anonymous. Id. at p. 196. Additionally, Dr. Haq instructed Gibbs to see a psychiatrist about his depression and anxiety issues. *Id.*, at p. 196.

On October 16, 2008, Gibbs requested assistance from emergency medical services after suffering an alcohol related relapse. *Id.*, at p.213. Dr. Haq examined Gibbs again on October 28, 2008, and reviewed the records from Gibbs's October 16th admission to the emergency room. *Id.*,

[2] Gibb's focuses his motion on ALJ Masengill's findings concerning his physical impairments. For that reason, I will make only limited findings in regards to his mental health impairments.

at p. 193–94. Dr. Haq prescribed a 20mg daily dose of Citalopram as treatment for depression and instructed Gibbs to continue trying to get an appointment with a psychiatrist. *Id.*, at p. 194–94. Additionally, Dr. Haq noted that Gibbs's respiratory issues appeared to be under control. *Id.*, at p. 193.

At a follow up appointment in November 2008, Dr. Haq noted that Gibbs complained of "neck pain, right hip pain and left ankle pain." *Id.*, at p. 191. Dr. Haq suspected that a high hepatitis-C viral load might be the cause of Gibbs's pain and advised Gibbs to take Motrin PRN for the pain. *Id.*, at p. 191. Additionally, Dr. Haq prescribed Seroquel XR to treat Gibbs's anxiety and insomnia. *Id.*, at p. 192.

On December 30, 2008, Gibbs's admitted himself to an emergency room in Worcester, requesting detoxification, after drinking and "get[ting] violent." *Id.*, at p. 264. However, Gibbs "bolted" after he "was put on a stretcher for too long." *Id.*, at p. 343. Gibbs arranged for transportation to a veterans' hospital in Bedford, Massachusetts, where he admitted himself for detoxification. *Id.*, at p. 318, 342. At the hospital in Bedford, medical staff noted the following: that Gibbs reported pain in his right hip, and hallucinations while intoxicated; that Gibbs had a slight tremor; that Gibbs is "not suicidal, homicidal, psychotic or significantly cognitively impaired . . . ." *Id.*, at pp. 318–19, 332. Although Gibbs received a global assessment of functioning ("GAF")[3]score of 30, Dr. Dennis O'Neil (psychiatry) evaluated Gibbs and reported: "[t]houghts linear, goal related. No thoughts of harm to self or others. No Psychosis. Cognitively,

[3] "A GAF score between 61 and 70 indicates some mild symptoms or some difficulty in social, occupational, or school situations, but general functioning and the existence of some meaningful personal relationships. A score between 51 and 60 indicates that the individual has moderate symptoms or moderate difficulty in social occupational, or school situations. 'A GAF score of 41-50 indicates an individual has serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job.)'" *Cruz v. Astrue*, No. 11-40054-FDS, 2012 WL 220535, *2 n. 2 (D.Mass. Jan. 24, 2012)(internal citations and citation to quoted case omitted).

he is alert and grossly oriented. Insight and judgment fair." *Id.*, at p. 336–37. Upon Gibbs's discharge from a detoxification program in January 2009, Dr. Stuart Rosenthal found Gibbs "neither suicidal, homicidal, psychotic or significantly cognitively impaired although [Gibbs] does note a decrement in his cognitive function over the years with alcohol use." *Id.*, at p. 530. Further, Dr. Stuart assessed a GAF score of 50 at Gibbs's discharge. *Id.*, at p. 529.

In March 2009, Dr. Robert Holloway diagnosed Gibbs with the following: major depressive disorder, post traumatic stress disorder and alcohol dependence. *Id.*, at p. 619. In his evaluation of Gibbs, Dr. Holloway found "[Gibbs's] attention and concentration . . . grossly intact," and "no evidence of hallucinations, delusions or paranoia." *Id.*, at p. 617. Additionally Dr. Holloway described Gibbs's thinking as "goal directed, relevant and logical." *Id.*, at p. 617. Based on a "Mini Mental Status Exam," Dr. Holloway labeled Gibbs's cognitive impairment as "mild." *Id.*, at p. 618. He noted, Gibbs "will likely have difficulty remembering detailed oral instructions, follow[ing] multi-step oral commands and remember[ing] locations and work related procedures." *Id.*, at p. 618. Finally, Dr. Holloway gave Gibbs a GAF score of 50-52. *Id.*, at p. 619.

At a medication review appointment in June 2009, Dr. Orlando Lightfoot counseled Gibbs about programs and medication for quitting smoking. *Id.*, at p. 723. Gibbs declined. *Id.*, at p. 723. Additionally, Dr. Lightfoot noted that Gibbs appeared "alert, verbal, cooperative, thought[ful], anxious, withdrawn." *Id.*, at p. 721. Dr. Lightfoot assessed a GAF score of 58, he stated: "[m]ildly compensated man with Bipolar Disorder, most recent Depressed . . . Post Traumatic Stress Disorder . . . ." *Id.*, at p. 721.

In July 2009, Dr. Todd Reed, Gibbs's primary care physician, ordered an MRI to assess Gibbs's continued complaint of hip pain. *Id.*, at p. 693. The conclusion of the MRI report stated: "findings consistent with small particle thickness tear and tendinosis of the right gluteus medius

and gluteus minimus tendons . . . . Findings may result in greater trochanteric pain." . Clinical correlation was advised. *Id.*, at p. 694.

At an examination in September 2009, Dr. Reed noted the MRI findings and prescribed physical therapy. *Id.*, at p. 771. Additionally, Dr. Reed prescribed continued inhaler usage because Gibbs's "lung volumes show hyperinflation and air trapping." *Id.*, at p. 769. Dr. Reed also found that Gibbs had "good judgment/insight. Memory intact. Mood and affect appropriate." *Id.*, at p. 770. Gibbs next saw Dr. Reed in February 2010. Dr. Reed noted that Gibbs's right hip and thigh pain were chronic, but that his hip x-ray was normal. He refused a lidocaine patch and was prescribed Motrin. Physical therapy was noted to be beneficial. *Id.*, at 888-890.

In May 2010, Gibbs saw Dr. Haq because he was experiencing lower back pain. Dr. Haq found his pain was probably secondary to osteoarthritis and degenerative joint disease. Dr. Haq prescribed Flexeril PRN along with Motrin and Tylenol for the pain. He also referred Gibbs to physical therapy for evaluation *Id.*, at 838. In June 2010, Gibbs saw Dr. Haq for a follow-up appointment concerning his back-pain. As to Gibbs's joints, bones and muscles, Dr. Haq reported "no contractures, malalignment, tenderness, or bony abnormalities and normal movement of all extremities." *Id.*, at p. 831. Dr. Haq referred Gibbs for physical therapy. On June 15, 2010, his physical therapy evaluation indicated that his pain level was currently 4 (on a scale of 10) and that the maximum pain level he experiences is 10. *Id.*, at 835.

Gibbs was seen by Dr. Reed on July 2, 2010 for a follow-up. Nothing remarkable was reported; Dr. Reed went over a medical plan with Gibbs which included the need to avoid drinking. Dr. Reed also reviewed his diet and his tobacco abuse and reconciled his medication list. Dr. Reed reported a normal hip x-ray and that physical therapy was completed. *Id.*, at 859.

*5. Residual Functional Capacity Assessment*

On January 24, 2009, Dr. H. Astarjian completed a Residual Functional Capacity ("RFC") Assessment of Gibbs. *Id.*, at pp. 496-510. Dr. Astarjian concluded that Gibbs could perform the following activates: occasionally lift twenty pounds; frequently lift and or carry up to ten pounds; stand and or walk (with normal breaks) up to six hours in an eight hour day; unlimited pushing and pulling abilities (within the already noted weight limitations). *Id.*, at p. 498. Dr. Astarjian did not find any postural limitations, manipulative limitations, visual limitations, or communicative limitations. *Id.*, at p. 500–02. The only reported environmental limitation is: "avoid concentrated exposure" to "fumes, odors, dusts, gases, poor ventilation, etc." *Id.*, at p. 504. In support of his assessment, Dr. Astarjian noted the following: that Gibbs's Hepatitis C bacterial count was zero; that although Gibbs breathed heavily, his COPD did not cause frequent exacerbations requiring hospitalization; also that physical therapy appears to be helping Gibbs's hip pain because his "gait is normal and unassisted." *Id.*, at p. 498–500.

On May 15, 2009, Dr. Celeste Derecho completed a Mental RFC Assessment of Gibbs. *Id.*, at pp. 634-36. Dr. Derecho found "moderate limitation" in the following areas: ability to understand, remember and carry out detailed instructions; ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; ability to complete a normal work-day and workweek without interruptions and without an unreasonable number of rest periods; and ability to respond appropriately to changes in the work setting. *Id.*, at p. 635. The only "marked limitation" Dr. Derecho found was in Gibbs's "ability to interact appropriately with the general public." *Id.*, at p. 635. In her notes, Dr. Derecho stated: "[d]oes not have psych symptoms that would prevent adequate pace and attendance at a full-time job … . Could respond adequately to simple directions and instructions from a supervisor in the context of

a routine job." *Id.*, at p. 636. Dr. Derecho suggested that Gibbs would perform best away from the general public and would require adequate adjustment time and reminders for procedural changes. *Id.*, at p. 636. However, Dr. Derecho noted that Gibbs is capable of responding to danger and does not have "impaired judgment, delusions or psychotic symptoms" that would make him a distraction to co-workers. *Id.*, at p. 636.

In July 2009, Dr. Reed completed a physical RFC assessment of Gibbs. *Id.*, at pp. 826-828. Dr. Reed diagnosed Gibbs with hip pain, COPD and PTSD; his prognosis was good. *Id.*, at 826. He indicated that Gibbs frequently experienced pain and/or symptoms severe enough to interfere with his concentration and attention and that he is severely limited with respect to dealing with stress. *Id.* Dr. Reed opined that Gibbs: could walk one city block without rest; could continuously sit for 30 minutes and stand for 10 minutes at one time; could sit and stand/walk for less than two hours in an eight hour working day (with normal breaks); would be required to walk every 30 minutes for about 10 minutes; would need a job which would permit him to shift positions at will (*i.e.*, from standing, sitting or walking); would need to take unscheduled breaks approximately every 15 minutes; could lift 10 pounds or less occasionally and never lift more than 10 pounds; has significant limitations with respect to repetitive movements; could bend at the waist 5% of the time and twist at the waist 3 % of the time in an eight hour day; and would be required to be absent from work due to symptoms and/or treatment more than three times a month. *Id.*, at 826-28. He would also would be restricted from working in environments which: create dust, fumes or gases; have humidity issues; and where there is a lot of noise. *Id.*, at 828.

*6. <u>VE's Testimony</u>*

First, ALJ Masengill asked the Vocational Expert ("VE") to analyze Gibbs's past jobs. *Id.*, at p. 24. The VE rated Gibbs's employment as an "electricians helper" as semi-skilled, with a

Specific Vocational Preparation ("SVP") of 3, and performed at a very heavy exertion level. *Id.*, at p. 24. Additionally, the VE rated Gibbs's employment as a "dishwasher" as unskilled, with a SVP of 2, and performed at a medium exertion level. *Id.*, at 24.

Next, ALJ Masengill presented the VE with the following hypothetical scenario:

> [A]ssume a hypothetical individual of [Gibbs's] age, education and work experience. That individual would be limited to . . . light work activity; work should be simple and unskilled in nature; work should not entail more than incidental public contact; work should be outside of environments having more than incidental exposure to extremes of cold, heat, humidity, fumes, dust, or gas. Would an individual so limited be able to perform [Gibbs's] past job or other jobs listed in the national economy?

*Id.*, at p. 24. The VE testified that although the individual would be unable to perform Gibbs's past work, the individual could perform other work. *Id.*, at p. 24. The VE provided the following hypothetical occupations: (i) an "assembler," (SVP of 2, light exertion level) approximately 4,000 such jobs are available in Massachusetts and 400,000 available nationally; (ii) an "inserter," (SVP of 1, light exertion level) approximately 3,000 such jobs are available in Massachusetts and 300,000 available nationally; a "linen sorter" (SVP of 2, light exertion level) approximately 2,000 such jobs are available in Massachusetts and 250,000 available nationally. *Id.*, at p. 25.

Second, ALJ Masengill proposed the following amended hypothetical: "[a]ssume additional limitations based on the psychiatric symptoms, with potential side effects of a variety of medication if the individual is off task at least 25% of the workday, how does that effect your testimony?" *Id.*, at p. 25. The VE testified that the individual would be unemployable; "no jobs they could perform." *Id.*, at p. 25.

Gibbs's counsel then asked the VE whether an individual with an average absentee rate of three days per month, under either of ALJ Masengill's hypotheticals, would be employable. *Id.*, at

p. 25. The VE testified that the individual would not be employable; "no jobs they could perform." *Id.*, at p. 25.

*7. ALJ Masengill's Factual and Legal Findings*

ALJ Masengill made the following determinations:

> 1. The claimant met the insured status requirements of the Social Security Act through June 30, 2009 . . . .
>
> . . . .
>
> 2. The claimant has not engaged in substantial gainful activity since August 21, 2008, the alleged onset date . . . .
>
> . . . .
>
> 3. The claimant has the following severe impairments: right hip pain, chronic obstructive pulmonary disease (COPD), post traumatic stress disorder (PTSD), depression, history of hepatitis C and a history of alcohol abuse, currently in early remission . . . .
>
> . . . .
>
> 4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments.
>
> . . . .
>
> 5. . . . [T]he claimant has the residual functional capacity to perform light work . . . including frequently lifting ten pounds, occasionally lifted twenty pounds and sitting, standing and walking six hours during an eight-hour workday, but would need to avoid exposure to temperature extremes, humidity, fumes, odors, dust, gases and poor ventilation and would be limited to simple, unskilled tasks with no more than occasional contact with co-workers and no more than incidental contact with the general public.
>
> . . . .
>
> 6. The claimant is unable to perform any past relevant work . . . .
>
> . . . .
>
> 7. The claimant was born on February 5, 1957 and was 51 years old, which is defined as an individual approaching advanced age, on the alleged disability onset date . . . .
>
> . . . .
>
> 8. The claimant has at least a high school education and is able to communicate in English . . . .
>
> . . . .
>
> 9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills . . . .

> 10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform . . . .
>
> . . . .
>
> 11. The Claimant has not been under a disability as defined in the Social Security Act, from August 21, 2008, through the date of this decision . . . .

*Id.*, at p. 37–44.

**Standard of Review**

*Affirmance or Reversal of Commissioner's Decision*

Under § 205(g) of the Act, this Court may affirm, modify, or reverse the Commissioner's decision, with or without remanding the case for a rehearing. *See* 42 U.S.C. § 405(g). The ALJ's finding on any fact shall be conclusive if supported by substantial evidence and must be upheld "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion," even if the record could justify a different conclusion. *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981); *see also Evangelista v. Sec'y of Health & Human Servs.*, 826 F.2d 136, 144 (1st Cir. 1987).

In applying the "substantial evidence" standard, the Court must bear in mind that it is the province of the ALJ, not the Court, to find facts, decide issues of credibility, draw inferences from the record, and resolve conflicts in the evidence. *Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 755, 769 (1st Cir. 1991). Ultimately, the Court may affirm, modify, or reverse the Commissioner's decision, with or without remanding the cause for a rehearing, 42 U.S.C §405(g)4, but reversal is warranted only if the ALJ committed a legal or factual error in evaluating

---

4 Section 405(g) provides that "[t]he [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive....".

a claim or if the record contains no "evidence rationally adequate… . to justify the conclusion." *Roman-Roman v. Commissioner of Social Security*, 114. Fed. App'x. 410, (1st Cir. 2004); *see also Manso-Pizarro v. Sec'y of Health and Human Services*, 76 F. 3d. 15 (1st Cir. 1996).

*Standard for Entitlement to Disability Insurance Benefits*

In order to qualify for disability insurance benefits, a claimant must demonstrate that he is disabled within the meaning of the Act. The Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment(s) must be severe enough to prevent the claimant from performing not only his past work, but any substantial gainful work that exists in the national economy. 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1560(c)(1). Furthermore, to be entitled to SSDI, a claimant is eligible for benefits where s/he demonstrates that s/he was disabled on or before the date before which s/he was last insured. 42 U.S.C. § 423(a)(1)(A). The claimant has the burden of establishing that s/he was disabled before expiration of his/her insured status. *Brunson v. Astrue*, 387 Fed.Appx. 459 (5th Cir. 2010).

An applicant's impairment is evaluated under a five-step analysis set forth in the regulations promulgated under the statute. 20 C.F.R. § 404.1520. The First Circuit has described the analytical sequence as follows:

> First, is the claimant currently employed? If he is, the claimant is automatically considered not disabled.
>
> Second, does the claimant have a severe impairment . . . mean[ing] an impairment 'which significantly limits his or his physical or mental capacity to perform basic work-related functions[?]' If the

> claimant does not have an impairment of at least this degree of severity, he is automatically considered not disabled.
>
> Third, does the claimant have an impairment equivalent to a specific list of impairments contained in [Appendix 1 of the Social Security regulations]? If the claimant has an impairment of so serious a degree of severity, the claimant is automatically found disabled.
>
> These first three tests are "threshold" tests. If the claimant is working or has the physical or mental capacity to perform "basic work-related functions," he is automatically considered not disabled. If he has an Appendix 1-type impairment, he is automatically considered disabled. In either case, his claim is determined at the "threshold." If, however, his ability to perform basic work-related functions is impaired significantly (test 2) but there is no "Appendix 1" impairment (test 3), the SSA goes on to ask the fourth question:
>
> Fourth, does the claimant's impairments prevent him from performing work of the sort he has done in the past? If not, he is not disabled. If so, the agency asks the fifth question.
>
> Fifth, does the claimant's impairment prevent him from performing other work of the sort found in the economy? If so, he is disabled; if not, he is not disabled.

*Goodermote v. Sec'y of Health & Human Servs.*, 690 F.2d 5, 6-7 (1st Cir. 1982).

The burden of proof is on the applicant as to the first four steps of the analysis. *See* 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the [ALJ] may require."). At the fifth step of the analysis, the burden shifts to the Commissioner to show that the claimant is capable of performing jobs available in the national economy. *Freeman v. Barnhart*, 274 F.3d 606, 608 (1st Cir. 2001). In making that determination, the ALJ must assess the claimant's RFC in combination with vocational factors, including the claimant's age, education, and work experience. 20 C.F.R. § 404.1560(c).

**Discussion**

The parties do not dispute that Gibbs has not been engaged in substantial gainful employment since August 21, 2008, that his date last insured was June 30, 2009**,** that he has severe impairments, that he does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments, and that his impairment prevents performing his past work. Disagreement arises, however, in connection with step five of the sequential evaluation process, *i.e.*, the evidence relied on by ALJ Masengill in making his decision as to whether Gibb's impairment prevents him from performing other work of the sort found in the economy.

*Scope of the Issues Raised In Gibb's Appeal*

In support of his motion to reverse/remand, Gibbs asserts that ALJ Masengill's decision is not supported by substantial evidence, first, because ALJ Masengill failed to address a significant medical record by his treating physician, Dr. Reed, and therefore, failed to address one of his significant medical conditions, greater trochanteric pain. Gibbs also asserts that ALJ Masengill erroneously dismisses Dr. Reed's opinion regarding his chronic pain because ALJ Masengill found the opinion inconsistent with his examination findings (that Gibb's was entirely normal). Gibbs argues that as a result, ALJ Masengill erroneously concluded that to the extent his treating sources imposed greater limitations on his activities, it was because of his subjective allegations rather than objective medical findings. By so doing, ALJ Masengill substituted hi his own medical opinion for that of the medial experts. Finally, Gibbs asserts that ALJ Masengill's decision is not supported by the substantial evidence in the record because he failed to consider his treating physician's opinion that his various medical conditions would require him to miss work,

on average, three days a month. This is significant because the VE testified that absences of two-three days per month would preclude gainful employment.

The Respondent, on the other hand, argues that ALJ Masengill properly assessed the medical evidence. Specifically, ALJ Masengill's finding as to Plaintiffs RFC (both physical and mental) was consistent with the opinion of the medical experts and therefore, he did not substitute his opinion for that of the medical experts. Respondent further argues that ALJ Masengill did not err by ignoring Dr. Reed's capacities assessment and his opinion that Plaintiff would miss at least three days of work a month due to his impairment, because neither opinion is medically supported and both are inconsistent with the substantial evidence in the record. The Respondent further argues that ALJ Masengill did not ignore Plaintiff's right hip condition, rather he specifically found that he did have severe right hop problems and hip pain. However, after conducting the required analysis, ALJ Masengill found that based on the medical evidence, Plaintiff's medical impairments, including his hip, could not possibly cause the degree of limitations he alleged.

*Whether ALJ Masengill Ignored Medical Evidence and Substituted His Own Judgment*

It is true, as Gibbs contends, that "[w]ith few exceptions ... an ALJ, as a lay person, is not qualified to interpret raw data in a medical record". *Manso-Pizarro*, 76 F.3d at 17. At the same time, "where the medical evidence shows relatively little physical impairment, an ALJ permissibly can render a commonsense judgment about functional capacity even without a physician's assessment." *Id.* Additionally, the ALJ has the discretionary power to discount medical opinions that are inconsistent with the majority of medical evidence in the record. *Keating v. Sec'y of Health and Human Servs.*, 848 F.2d 271, 276 (1st Cir. 1988); *see also, Haidas v. Astrue*, 2010 WL 1408618 (D.Mass. Mar. 31, 2010)(citing *Morales v. Comm'r of Soc. Sec.*, 2 Fed. App'x 34, 36 (1st Cir. 2001)).

This is a difficult case, both for ALJ Masengill and reviewing court. The difficulty comes because particularly with respect to Gibb's alleged physical impairments, there is contrary medical evidence in the record concerning his medical impairments and the associated degree of physical limitations. Nonetheless, the question before me is not whether I would reach a different conclusion than ALJ Masengill, rather it is whether ALJ Masengill properly considered all of the medical evidence in the record and whether his decision is supported by the substantial medical evidence. I find that it is. As pointed out by the Respondent, ALJ Masengill did not ignore that Gibbs has been diagnosed with a right hip condition. On the contrary, ALJ Masengill specifically found that he has "long history of right hip pain" and that a July 2009 MRI revealed consistent with "small partial tendinosis tears and gluteal tendinosis." *Tr.,* at p. 37. ALJ Masengill then went through a very thoughtful and detailed analysis of Gibb's subjective complaints and whether those complaints were supported by the medical evidence (in particular, medical expert reports), the Plaintiff's own reports concerning his daily activities, third party observations concerning his ability to walk, sit and stand, and the results of the RFC assessment. ALJ Masengill acknowledged Dr. Reed's July 2009 RFC assessment, but found that the restrictions imposed therein were not supported by Dr. Reed's own treatment notes of September 2009, February 2010 and July 2010. Furthermore, Dr. Haq saw Plaintiff in June 2010 and reported that Plaintiff's lungs were normal, his sensation intact, his gait was normal and there was no tenderness in any extremities. The record also reflects that despite Plaintiff's testimony in November 2010 that his pain was 7-8/10 with medication and 10/10 without, in June 2010, for purposes of a physical therapy evaluation, Plaintiff rated his pain at 4/10.

The First Circuit has noted, "that complaints of pain need not be precisely corroborated by objective findings, but they must be consistent with medical findings." *Dupuis v. Sec'y of Health*

*and Human Servs.*, 869 F.2d 622, 623 (1st Cir. 1989). Additionally, the ALJ's determination concerning a claimant's complaints of pain and external limitations "must be supported by substantial evidence and the ALJ must make specific findings as to the relevant evidence [s/he] considered in determining to disbelieve the [claimant]". *DaRosa v. Sec'y of Health and Human Servs.*, 803 F. 2d 24, 26 (1st Cir. 1986). In Gibb's case, ALJ Masengill fully considered the medical record as a whole and was sufficiently specific as to why he did not give much weight to Gibb's subjective complaints and Dr. Reed's RFC assessment. Therefore, I cannot find that ALJ ignored Plaintiff's significant medical condition (*i.e.*, his right hip) or that he impermissibly substituted his opinion for that of the medical experts. I further find that ALJ Masengill's findings in this regard were supported by the substantial evidence.

*Whether ALJ Masengill Failed to Consider The Attendance Limitation*

Dr. Reed, Gibb's treating physician, opined that as a result of his impairments or treatments, he would absent from work more than three times a month. Gibbs asserts that in light of the VE's finding that absences of approximately two-three times a month would preclude gainful employment, ALJ Masengill's failure to address Dr. Reed's uncontroverted opinion was error. This would be a close call if the record reflected that ALJ Masengill failed to consider the VE's finding and ignored Dr. Reed's opinion. However, ALJ Masengill did not so much ignore the VE's finding as he discounted the assumption upon which the finding was based. More specifically, ALJ Masengill dismissed the hypothetical including the limitation that Gibbs is likely to be frequently absent from work because it was based on a limitation contained in Dr. Reed's RFC assessment— ALJ Masengill found that the limitations Dr. Reed imposed were not supported by the medical evidence. *Id.*, at pp. 43-44. I agree.

Dr. Reed's RFC assessment contains very severe limitations which would disqualify Gibbs from performing any work. However, the severe limitations imposed by Dr. Reed— on lifting, walking, sitting, etc.— are not supported by the medical evidence, including treatment notes of other treating physicians such as Dr. Haq, or even Dr. Reed's own treatment notes. Furthermore, they are not supported by the any of the RFC assessments conducted by those medical professions who reviewed Gibbs's medical records.

Reading ALJ Masengill's decision as a whole, he acknowledged the VE's testimony that Gibbs would be disabled from performing any kind of work if he were absent from work three times a month, however, he rejected that limitation on the grounds that the opinions contained in Dr. Reed's RFC assessment were not supported by the medical evidence. That determination is supported by the substantial evidence in the record.[5]

## Conclusion

For the foregoing reasons, the Plaintiff's Motion For Order Reversing Decision Of The Commissioner (Docket No. 11) is ***denied*** and Defendant's Motion For Order Affirming The Decision Of The Commissioner (Docket No. 18) is ***allowed***.

**/s/ Timothy S. Hillman**
TIMOTHY S. HILLMAN
DISTRICT JUDGE

[5] Gibbs cites *Walker v. Barnhart*, Civ.A.No. 04-11752-DPW, 2005 WO 2323169 (D.Mass. Nov. 10, 2008), in support of his position. However, this case is distinguishable from *Walker*, in that in this case, reading the record as a whole, ALJ Masengill found that Dr. Reed's assessment regarding Gibb's likely absenteeism was not credible and therefore, he refused to accept it. In *Walker*, on the other hand, the ALJ totally ignored any evidence regarding the claimant's likely absenteeism without explanation. Therefore, the court ordered the matter remanded for further proceedings for the ALJ to make specific findings on that issue.